Filed 2/26/25  P. v. Wilson CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MARQUES ADAN WILSON,<br><br>    Defendant and Appellant. | G062747<br><br>(Super. Ct. No. FSB20001056)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of San Bernardino, Alexander R. Martinez, Judge. Affirmed in part, reversed in part, and remanded with instructions.

Alex Coolman and Howard Cohen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and Maxine Hart, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted appellant Marques Adan Wilson on one count of first degree felony murder and three counts of robbery. On appeal, Wilson challenges only his felony murder conviction and argues the trial court erred by, inter alia, failing to instruct on second degree murder. We conclude the trial court erred by failing to instruct on implied malice second degree murder and the error was not harmless. Wilson does not challenge the robbery convictions. Thus, we affirm in part, reverse in part, and remand with instructions.

FACTUAL AND PROCEDURAL HISTORY

I.

CHARGES

In an amended information, Wilson was charged with the murder of Cesar Deharo Ponce (Pen. Code, § 187, subd. (a)[1]; count 1), and three counts of second degree robbery (§ 211; counts 2–4). Ponce, T.V., and M.B. were the alleged victims as to counts 2 through 4. Seventeen aggravating factors were also alleged pursuant to section 1170, subdivision (b)(2).

II.

EVIDENCE AT TRIAL

On March 5, 2020, a robbery and killing occurred at The Smoke Shop Plug, which was a store divided into three sections: the front section was a smoke shop, the middle section was a storage area and security room, and the back section was a marijuana dispensary. Ponce, who worked as security along with M.R., was shot and killed. Ponce suffered a gunshot wound to the side of his head from a .22 caliber bullet.

---

[1] All further statutory references are to this code.

Jane Doe testified, on March 5, 2020, she was staying at a motel with Wilson. Doe said Wilson had been with her that day and told her "'I'll be back. I'm going to go with the homies.'" Doe stated she went to sleep and was awakened by Wilson slapping her face. Wilson said to her "his friend had got shot and that he almost got shot, and [she] was over here sleeping. Why [is she] sleeping if he almost got shot and his friend got shot." Doe said Wilson told her there was an individual who was the getaway driver and did not go into the store. Doe recounted Wilson said A.R. had been shot and Wilson and the individual who was the getaway driver had taken A.R. to the hospital.[2] Doe said she had seen A.R. hang out with Wilson before. She also said she heard Wilson talk about two other individuals who were involved, including someone whom Wilson was mad at because that person had tried to shoot the security camera and missed.[3] Doe also noted Wilson told her the dispensary would be easy to rob because the people working there were always high on cocaine. Doe stated Wilson told her he and A.R. started to fight with the marijuana dispensary employee and Ponce pulled out a firearm, Ponce was initially going to shoot Wilson, and A.R. took the gun away from Ponce shooting Ponce in the head.

Doe testified Wilson returned with a revolver and hid it under the sink of the motel room for a couple of days, and Wilson told her he later gave the gun to someone who "sold it on the street." Doe also said Wilson had

---

[2] A police officer testified he went to the hospital to speak with A.R., who was then 15 or 16 years old and had a gunshot wound to his chest.

[3] There were bullet holes in the area of a security camera, and cartridge casings were found that were a different caliber than .22.

returned with marijuana. Doe stated Wilson said he would kill her if she ever told on him.

X.S. testified she was in the back section of the store with her friend when the incident occurred. When two men walked in, X.S. said she moved to the waiting area with her friend, and "there was yelling, a gun was pulled out, and they started yelling at everybody to get on the floor." X.S. stated one of the two individuals had a gun, and when he noticed X.S. in the waiting area, he pointed the gun at her and told her to get on the ground. X.S. recounted she saw the other individual putting things in a bag. She said the two individuals left "the same way that you would come in from the front" of the store. X.S. also stated M.R. came into the back area, "[h]e was in pretty bad condition" with "a really bad gash at the very top of his head[,]" and he "mentioned that he got pistol-whipped." X.S. said she recognized the individual with the gun from high school (J.B.) and found Instagram accounts for J.B., the other individual (A.C.), and an apparent joint account for J.B. and A.C., which she provided to the police.

T.V. testified she was working in the back of the store when the incident occurred, her boyfriend (M.B.) arrived shortly before closing, and two female customers were also in the back of the store. T.V. said she knew Ponce carried a firearm and he had a .22 on the night of the incident. T.V. said two men came into the back who she recognized as having been there earlier in the day. After talking with them, T.V. said one individual pulled out a gun and said "'[t]his is a fucking robbery. Don't move or I'll shoot.'" She said the other individual "was just ravaging, grabbing all the stuff underneath the casings, and he tried to grab [her] phone. He was just grabbing whatever he

4

could."[4] As the two individuals were leaving, she said she recalled hearing more than three gunshots. She confirmed Wilson was not the man who pointed the gun at her. Although T.V. did not recall how long the two men were in the back, she said "[i]t happened quick"; it was more than four minutes but she was not sure if it was more than five minutes. T.V. stated M.R. came into the back and said he was hit in the face with a gun.

M.B. testified, on March 5, 2020, he went to the shop to pick up his girlfriend (T.V.). M.B. said Ponce did not carry a firearm all of the time but that night Ponce was carrying a .22 revolver. M.B. stated he was in the back with T.V. when two men walked in and began looking at marijuana and talking to T.V. M.B. said one man brought out a gun, which M.B. thought was a .45 semiautomatic, and the other man was grabbing marijuana. M.B. recounted the man with the gun took M.B.'s cell phone. M.B. said the man with the gun ran through the security room and the other man ran out the back. M.B. stated he followed the man out the back to where he could see the front of the store and saw three or four men exiting the front. M.B. said when he went to check on Ponce, he did not see Ponce's gun.

While the two men were still in the back of the store, M.B. testified he heard struggling coming from the security room. M.B. estimated it was about 15 minutes from the arrival of the two men until he heard struggling in the security room. "[A]nother ten more minutes" or "maybe five" after hearing the struggle, M.B. said he then heard gunshots.[5] M.B. stated he

---

[4] T.V. said the man took her phone, but she was able to find it later.

[5] On cross-examination, M.B. said the time between the struggle and the first gunshot was "[p]ossibly 10, 15 minutes."

5

heard a gunshot from a smaller caliber, and then "[n]ot even a minute" later, he heard gunshots from a different caliber (he did not know how many shots were fired in total). M.B. said the gunshots occurred as the man who had the gun was running out.

A person who was in her vehicle across the street from the shop at the time of the incident also testified. She testified she heard two gunshots, then a pause of "maybe 30 seconds," and then two other gunshots. She stated she then saw a light beige/gray sedan leave the side of the street from where she thought the shots were fired, and she previously told a police officer it was a four-door white sedan. She said she saw a driver and a few other people in the vehicle but she was not sure exactly how many.

M.R. testified, on March 5, 2020, he was working at the front of the store. M.R. said Ponce worked in the security area. M.R. stated he did not remember if Ponce was armed. M.R. said all he remembered from the incident "was just getting up and getting out." In response to numerous questions about the incident, M.R. largely testified he did not remember.

Recordings were played to the jury of M.R.'s prior interviews with police. M.R. said he worked as security at the store and was not armed. Shortly before closing, M.R. said three men entered, and M.R. recognized the first man as someone he had messaged with on Instagram (Wilson)[6] but he did not know the other two individuals. M.R. said he asked the second

_____

[6] M.R. stated he previously had communications with Wilson on Instagram, including about selling a gun, but M.R. tried looking him up after the incident and nothing came up. M.R. provided the name of Wilson's Instagram account to the police. The police obtained search warrants for certain social media accounts and located photos of Wilson and A.R. with firearms. Wilson's account also sent a message to M.R. around 2:30 a.m. on March 5 asking whether he had weed.

individual to take his hood down, and the third individual pointed a revolver in his face. M.R. noted he did not see Wilson with a weapon, and M.R. saw Wilson smash a monitor. M.R. said he heard a gunshot, then "hold him still, hold him still," and then several more gunshots, and M.R. was then hit (he thought he was hit by a knee or foot but he was not sure). M.R. stated Ponce carried a .22 and M.R. was pretty sure Ponce shot first because it was not as loud as the next shot. M.R. said he heard one of the men say "'[h]e got me.'" M.R. also identified Wilson in a photo lineup.

The jury heard an audio recording sent the day after the incident from Wilson's social media account, in which a voice on the recording said, "I won't speak on who I killed. You know I did. You know he dead." A police officer who previously spoke with Wilson testified the voice on the audio was Wilson's.

A forensic pathologist testified Ponce's cause of death was a gunshot wound, which was to the side of his head, and Ponce had some abrasions consistent with a struggle. The forensic pathologist said, while he could not give an exact distance from which the gun was fired, it was a range of a half a centimeter to 24 to 36 inches away. The forensic pathologist also stated Ponce tested positive for methamphetamine, amphetamine, and cocaine, which were powerful stimulants and can cause a person to act impulsively.

On March 23, 2020, Wilson was pulled over while driving a four-door white sedan. Six live rounds were found in the car, which included "four WMA 20 cartridges[,]" "one CDC nine[-]millimeter Luger cartridge," and "one GECO nine[-]millimeter cartridge."

7

## JURY INSTRUCTIONS, JURY DELIBERATIONS, AND VERDICT

The trial court provided to the jury, inter alia, a felony murder instruction based on CALCRIM No. 540B. The trial court did not instruct on second degree murder or voluntary manslaughter. During closing arguments, the prosecutor's theory was the actual killer was A.R., but Wilson was guilty of felony murder because Wilson intended to kill and aided and abetted the perpetrator in the commission of the killing, or alternatively, Wilson was a major participant and acted with reckless indifference to human life. Wilson's counsel conceded the jury should find Wilson guilty of robbery, but Wilson's counsel contended Wilson did not act with reckless indifference to human life.

While deliberating, the jury asked: "Can we request a lesser charge on count 1[?]" After discussing with counsel, the trial court responded: "No. There are no lesser charges available to felony murder under California law." While discussing the response, Wilson's counsel suggested adding the word "available" and, regarding the final response, told the trial court "[t]hat makes sense." The jury also requested readback of certain testimony.

The jury found Wilson guilty on count 1 of first degree felony murder and guilty on counts 2, 3, and 4 of robbery.[7] The trial court sentenced Wilson to 25 years to life imprisonment on count 1, and imposed consecutive terms of five years on count 3 and one year on count 4. The trial court sentenced Wilson to five years on count 2 but stayed the sentence under section 654.

---

[7] After Wilson waived his right to a jury trial on the alleged aggravating factors, the trial court found three of these factors to be true.

DISCUSSION

Wilson asserts the trial court erred because it should have instructed on the lesser included offense of second degree murder. We conclude the trial court erred by not instructing on implied malice second degree murder and the error was not harmless.[8]

I.

FELONY MURDER AND SECOND DEGREE MURDER

"All murder . . . that is committed in the perpetration of, or attempt to perpetrate, . . . robbery . . . is murder of the first degree." (§ 189, subd. (a).) "[S]ection 189, as amended, now limits liability under a felony-murder theory principally to 'actual killer[s]' [citation] and those who, 'with the intent to kill,' aid or abet 'the actual killer in the commission of murder in the first degree' [citation]. Defendants who were neither actual killers nor acted with the intent to kill can be held liable for murder only if they were 'major participant[s] in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of . . . [s]ection 190.2'—that is, the statute defining the felony-murder special circumstance." (*People v. Strong* (2022) 13 Cal.5th 698, 708.)

"[T]he California Supreme Court has provided a nonexclusive list of factors to assist the fact finder in determining whether a defendant was a

---

[8] Wilson also argues the trial court erred by failing to instruct on voluntary manslaughter. Additionally, Wilson asserts there was prosecutorial misconduct because, during his rebuttal closing argument, the prosecutor purportedly misstated the law regarding the requirements to prove reckless indifference to human life for felony murder. Given our conclusion the murder conviction should be reversed because of the failure to provide an implied malice second degree murder instruction, we need not address these other arguments. On remand, the trial court can address in the first instance, based on the evidence presented at any retrial on count 1, whether an instruction on voluntary manslaughter should be provided.

'major participant' in a felony murder, namely: 'What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?'" (*People v. Cody* (2023) 92 Cal.App.5th 87, 105–106 (*Cody*).) "'No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation "in criminal activities known to carry a grave risk of death" [citation] was sufficiently significant to be considered "major."'" (*Id.* at p. 106.)

"Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, "'[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.'" [Citation.] 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death"' satisfies the statutory requirement. [Citation.] Notably, 'the fact a participant

10

[or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life." (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).)

"To determine whether the defendant had the requisite mental state (reckless indifference to human life), the Supreme Court has held: 'We analyze the totality of the circumstances' in a manner that largely overlaps with our 'major participant' discussion. [Citation.] "'Although we state these two requirements separately, they often overlap,'" "'for the greater the defendant's participation in the felony murder, the more likely that he [or she] acted with reckless indifference to human life.""'" (*Cody, supra,* 92 Cal.App.5th at p. 106.) The California Supreme Court has noted "[r]elevant factors include: Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*Scoggins, supra,* 9 Cal.5th at p. 677.) As with the "major participant" determination, *ante*, not one of these considerations is necessary and none of them are necessarily sufficient. (*Ibid.*)

"Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder." (*People v. Knoller* (2007) 41 Cal.4th 139, 151 (*Knoller*).) "[M]alice may be express or implied." (§ 188, subd. (a).) Express

11

malice "requires an intent to unlawfully kill." (*People v. Schuller* (2023) 15 Cal.5th 237, 243 (*Schuller*).) "Malice is implied when the killing is proximately caused by "'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'"" (*Knoller, supra,* at p. 143.)

"""[U]nder direct aiding and abetting principles, an accomplice is guilty of an offense perpetrated by another [e.g., murder] if the accomplice aids the commission of that offense with 'knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends.'"" (*People v. Ramos* (2024) 103 Cal.App.5th 460, 465–466.) """In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering act, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life, and acting in conscious disregard for human life."" (*People v. Collins* (2025) 17 Cal.5th 293, 311, italics omitted.)

## II.

### SECOND DEGREE MURDER IS A LESSER INCLUDED OFFENSE HERE

"Under California law, trial courts must instruct the jury on lesser included offenses of the charged crime if substantial evidence supports the conclusion that the defendant committed the lesser included offense and

12

not the greater offense." (*People v. Gonzalez* (2018) 5 Cal.5th 186, 196.) "Substantial evidence in this context is evidence from which a reasonable jury could conclude that the defendant committed the lesser, but not the greater, offense." (*People v. Shockley* (2013) 58 Cal.4th 400, 403.) "'We apply the independent or de novo standard of review to the failure by the trial court to instruct on an assertedly lesser included offense.' [Citation.] In considering whether the trial court had a sua sponte duty to instruct the jury on lesser included offenses, we construe the evidence in the light most favorable to the appellant." (*People v. Smith* (2021) 70 Cal.App.5th 298, 308.)

"'For purposes of determining a trial court's instructional duties, [the California Supreme Court has] said that "a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, *or the facts actually alleged in the accusatory pleading*, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser."' [Citation.] When applying the accusatory pleading test, '[t]he trial court need only examine the accusatory pleading.' [Citation.] '[S]o long as the prosecution has chosen to allege a way of committing the greater offense that necessarily subsumes a lesser offense, and so long as there is substantial evidence that the defendant committed the lesser offense without also committing the greater, the trial court must instruct on the lesser included offense.'" (*People v. Banks* (2014) 59 Cal.4th 1113, 1160 (*Banks*), abrogated on another aground in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3.)

The parties dispute whether second degree murder is a lesser included offense in this case. Wilson asserts second degree murder is a lesser included offense under the accusatory pleading test. The Attorney General agrees it is a lesser included offense if the accusatory pleading test applies.

13

However, the Attorney General argues only the elements test applies here, and under the elements test, second degree murder is not a lesser included offense of felony murder. Wilson is correct.

The California Supreme Court's decision in *Banks* is instructive. In *Banks*, one of the counts alleged the defendant "'did willfully, unlawfully, and with malice aforethought murder [the victim], a human being.'"[9] (*Banks, supra,* 59 Cal.4th at p. 1157.) The jury was instructed only on felony murder for that count, and on appeal, the defendant argued the jury should have been instructed on second degree murder as a lesser included offense. (*Id.* at pp. 1158–1159.) The Court held, "under the accusatory pleading test, second degree murder was plainly a lesser included offense of felony murder *as charged*[.]" (*Id.* at p. 1160.) Similar to *Banks*, the amended information here alleged Wilson murdered Ponce with "malice aforethought[.]"[10] Thus, we conclude second degree murder is a lesser included offense of felony murder as charged in this case.

The Attorney General argues *People v. Huynh* (2012) 212 Cal.App.4th 295 (*Huynh*) is on point and the accusatory pleading test does not apply here because Wilson knew in advance the prosecution was only relying on a felony murder theory. In *Huynh*, the information alleged the defendant "'did unlawfully murder [the victim], a human being, in violation of'" section 187(a) and alleged two special circumstances under section 190.2,

---

[9] The prosecution also alleged "the murder occurred while defendant 'was engaged in the commission of the crime of attempted robbery, within the meaning of'" section 190.2, subdivision (a)(17). (*Banks, supra,* 59 Cal.4th at p. 1157.)

[10] The earlier filed complaint and information also alleged Wilson murdered Ponce with "malice aforethought[.]"

14

subdivision (a)(17). (*Id.* at p. 312.) "[T]he prosecution's case was tried strictly on a first degree felony-murder theory[,]" and the defendant argued on appeal an instruction on the lesser included offense of second degree murder should have been provided. (*Id.* at pp. 311–313.) The appellate court rejected this argument, in part because the accusatory pleading "did not have 'malice aforethought' language." (*Id.* at p. 313.) Here, the amended information alleged Wilson acted with "malice aforethought" and, thus, *Huynh* is distinguishable. (See *People v. Campbell* (2015) 233 Cal.App.4th 148, 162, fn. 8 [distinguishing *Huynh* "because the accusatory pleading alleged malice aforethought; the accusatory pleading in *Huynh* did not"].)

The Attorney General also cites *People v. Fontenot* (2019) 8 Cal.5th 57 (*Fontenot*) and contends the accusatory pleading test does not apply since "the information here merely tracks the statutory language and because [Wilson] had notice that the prosecution would attempt to prove felony murder and only felony murder." In *Fontenot*, the California Supreme Court stated, "[b]ecause the first amended information charging [the defendant] with completed kidnapping merely 'incorporate[d] the statutory definition of the charged offense without referring to the particular facts' in detail, we 'must rely on the statutory elements' alone." (*Fontenot, supra,* at p. 65.) However, we do not interpret this language in *Fontenot* as impliedly abrogating the application of the accusatory pleading test to facts akin to those in *Banks. Fontenot* involved a kidnapping charge (*Fontenot, supra,* at pp. 60, 65), not a "malice aforethought" murder charge under section 187, subdivision (a), that encompasses both second degree murder and felony murder. Indeed, in *People v. Wilson* (2021) 11 Cal.5th 259 (*Wilson*), which was decided after *Fontenot*, the California Supreme Court continued to apply *Banks* for the proposition "second degree murder was 'plainly' a lesser

included offense of the murder '*as charged.*'" (*Wilson, supra,* at p. 296 [concluding "[n]evertheless . . . the trial court's decision to forgo a nonpremeditated second-degree murder instruction was proper" because there was "'"'no evidence that the offense was less than that charged'"'"].)

III.

SUBSTANTIAL EVIDENCE SUPPORTED AN IMPLIED MALICE SECOND DEGREE MURDER INSTRUCTION AND THE ERROR WAS NOT HARMLESS

Wilson argues the evidence supported an instruction for second degree murder. For aiding and abetting implied malice murder, Wilson would have been required to, by words or conduct, aid the commission of the shooting, and know A.R. intended to shoot Ponce, intend to aid A.R. in shooting Ponce, know the shooting is dangerous to human life, and act in conscious disregard for human life. (See *People v. Reyes* (2023) 14 Cal.5th 981, 991–992 ["assuming the life-endangering act was the shooting, the trial court should have asked whether Reyes knew that [the other perpetrator] intended to shoot at the victim, intended to aid [the perpetrator] in the shooting, knew that the shooting was dangerous to life, and acted in conscious disregard for life"].)

Viewing the evidence in the light most favorable to Wilson, we conclude there was substantial evidence from which the jury could have found Wilson guilty of implied malice second degree murder but not felony murder.[11] Substantial evidence supported the theory Wilson and A.R. fought with Ponce, Ponce was able to use his gun to shoot A.R., and while Wilson

---

[11] We do not reach the same conclusion for express malice second degree murder. If the jury had found Wilson had intent to kill for purposes of second degree murder, then that also would have constituted intent to kill for purposes of felony murder under these circumstances. (See § 189, subd. (e)(2).)

16

was fighting with Ponce, A.R. was able to take Ponce's gun and shoot Ponce. A reasonable jury could have concluded Wilson aided the shooting by fighting with Ponce and knew A.R. intended to shoot Ponce, intended to aid A.R. in the shooting, knew that the shooting was dangerous to life, and acted in conscious disregard for life.

Moreover, had the jury concluded Wilson committed implied malice second degree murder, it also could have concluded Wilson did not commit felony murder. If Wilson did not have intent to kill, he could have been liable for felony murder if he "was a major participant in the underlying felony and acted with reckless indifference to human life[.]" (§ 189, subd. (e)(3).) Notably, reckless indifference to life for felony murder liability "'requires subjective awareness of a higher degree of risk than the "conscious disregard for human life" required for conviction of second degree murder based on implied malice.'" (*People v. Underwood* (2024) 99 Cal.App.5th 303, 317.) A reasonable jury could conclude Wilson acted with conscious disregard but not with the higher reckless indifference.[12] Thus, we conclude the trial court erred by failing to instruct on implied malice second degree murder.

Turning to whether the error was harmless, the parties dispute whether the state or federal standard for harmless error applies. "'The "generally applicable California test for harmless error" is set forth in [*People v. Watson* (1956) 46 Cal.2d 818 (*Watson*)]. [Citation.] Under the *Watson* test, we deem an error harmless unless it is "reasonably probable" the outcome would have been different in the absence of the error. [Citation.] As a general

---

[12] The Attorney General also asserts Wilson must have had intent to kill if he knew A.R. was going to shoot Ponce in the head. While evidence could support intent to kill, the evidence does not foreclose a finding of conscious disregard.

17

matter, this test applies to ""incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error."""" (*Schuller, supra,* 15 Cal.5th at p. 251.) """In contrast, we evaluate the harmlessness of violations of the federal Constitution under the standard set forth in [*Chapman v. California* (1967) 386 U.S. 18 (*Chapman*)]." [Citation.] This "stricter" standard of review requires reversal unless the error is "harmless beyond a reasonable doubt.""" (*Ibid.*) We need not resolve the parties' dispute over which standard applies because, even assuming the less stringent *Watson* standard applies, we conclude the error was not harmless.

While strong evidence supported Wilson acted with reckless indifference, there also was evidence supporting Wilson did not act with reckless indifference. For example, although there was evidence two of the participants brought guns to the robbery and Wilson was present, there also was evidence Wilson never possessed a gun during the robbery. Additionally, the testimony differed regarding how long the incident lasted (M.B. stated the two men had been in the back for about 15 minutes before he heard struggling in the security room, and then another 5 to 15 more minutes before he heard gunshots; whereas T.V. said the two men were in the back for more than four minutes but she was not sure if it was more than five minutes and it was "quick").[13]

Moreover, during deliberations, the jury asked if it could request "a lesser charge" on count 1. Under the circumstances of this case, the jury's

---

[13] We similarly conclude the evidence supporting intent to kill for purposes of felony murder was not so strong such that we can find the error was harmless. (See § 189, subd. (e)(2).)

specific question requesting "a lesser charge" further supports concluding the error was not harmless. (See *People v. Nero* (2010) 181 Cal.App.4th 504, 519–520 [concluding error not harmless under *Chapman* standard where jury's questions "indicated it was considering an outcome other than second degree murder"]; *People v. Rouston* (2024) 99 Cal.App.5th 997, 1018 [noting jury's "questions suggested the jury's deliberations concerning whether [the defendant] fired a gun were close"].)

In sum, under the circumstances of this case, it was reasonably probable that a result more favorable to Wilson would have been reached.

## DISPOSITION

Wilson's conviction on count 1 for first degree felony murder is reversed; his convictions on counts 2, 3, and 4 are affirmed; and his sentences are vacated. The matter is remanded to the trial court for a possible retrial on count 1 and resentencing.


MOTOIKE, J.

WE CONCUR:


SANCHEZ, ACTING P. J.


DELANEY, J.

19